Good morning. Keith Habeisen on behalf of the appellants. May it please the court, counsel for defendants, and good morning, justices. I'm going to want to reserve a few minutes for follow-up. I didn't make those comments, but everybody knows 15 minutes for each side. You can reserve whatever portion of that you'd like for rebuttal. Okay. And we don't really restrict you to those 15 minutes, but we don't like you to repeat yourself and spend little time on the facts. We're acquainted with this. Okay. Thank you. Justices, we respectfully say that this court should reverse the judgment in favor of the defendants and remand for a new trial because of the reversible errors in the case below. The first reason for that is based upon Dr. Locke's participation and his role at trial. Well, let's get into Dr. Locke regarding how, what kind of notice you had that Dr. Locke was going to be a testifying expert witness. Okay. That came out, obviously, before the motion to bar was filed. And was he at that, prior to that motion being filed, was he disclosed as a 213 expert witness that was going to provide testimony at trial? Actually, with all due respect, Your Honor, the record is clear that Dr. Locke was not disclosed as a witness who was going to testify at trial until after the motion to bar was denied. Okay. But was he disclosed prior to then as a consulting expert? Obviously, right? Well, he was initially learned to be a doctor who had treated our clients unbeknownst to, you know, us as the attorneys. We got that. What about the 213 notice, disclosure? There was no 213 disclosure until after the motion to bar had been denied. And once the motion to bar had been denied, it almost served as a ruling on the 213 disclosure of him as a testifying expert. I mean, they both coincided. Do you understand what I mean? I think I understand what you're asking, Your Honor. Yes, sir. It almost served like notice because at that point, the motion to bar was denied and he would be allowed to testify as an expert witness at trial even though he had no 213 disclosure had been made up to that point. That's correct. I'm sorry, go ahead. Okay. There's no question in this case that the public policy of this State is very clear in terms of the duties of a physician to his patient. It involves loyalty of fiduciary duty and it involves a duty of confidentiality. And there's no question in this case that if Dr. Locke had been contacted by the defense after he was already a treating physician, every one of those would have been violated and he would have been barred. Let me ask you about that public policy. You base that public policy on the Petrillo case. And his progeny. And between the doctor and the patient. In this case, the doctor's not the defendant. Is there another perhaps unstated concern in the public policy rationale that in this situation, which you characterize as somewhat unique, that focuses on the impact on the trier of fact? When the trier of fact has an expert witness come in to testify with what might be described as a foot in each camp, that it puts that expert witness in a different light than the expert witnesses that otherwise might testify. Is there anything to that and do you have any support for that? Well, it kind of goes along with the comment I was going to make a little further on, and I'll address it now, is that in this situation, Dr. Locke, when he appeared at trial, did not just show up as a treating doctor who happened to have some, a treating doctor who the defense had improperly contacted. I'm not saying they did, but that's the usual situation. But in this situation, he showed up as a treating doctor whose main role at trial, if not his exclusive role, was to be beyond an advocate, a zealot. He wasn't a lawyer. Well, I'm talking about in terms of his advocacy as a witness, in terms of how far he went, in terms of disavowing all his publications in order to support a position. Mr. Basin, you indicated that part of your argument is that this witness was initially disclosed as a consulting expert. The agreed order related to him being a consulting expert. And you indicated that the motion to bar came up before he had been disclosed as a testifying expert. Is that correct? Yes. Did you renew any motion after this 213 disclosure that he would be a testifying expert? Did you renew the motion to bar before Judge Duncan was released? Your Honor, and I don't have it at my fingertips, I believe that in the short period of time leading up to trial with motions and what not, we addressed that with her in at least a proformal way. And she said she wasn't going to change her opinion. And as you know from the post-trial motion, she made it clear that she wouldn't have changed her opinion. All right. I believe that we satisfied ourselves with the court that there was no point in further pursuing a formal motion. All right. What was the, what is your understanding of the order that agreed to, in that order that she signed off on? What do you understand that that was in terms of the procedures that would follow? I understand exactly what the order says. Okay. And just to refresh the court's memory here, Dr. Ruiz was allowed to retain, consult with, and communicate with his retained consulting expert is the person who used such communications with Dr. Black regarding any medical conditions, alleged injuries, and damages flowing therefrom that occurred before his care and treatment. So it excluded any ex parte discussions with him about his actual treatment. It allowed them only to communicate, discuss with him, and consult with him about things that occurred before that. It does not explicitly or impliably in any way talk about him showing up as a witness at trial testifying against his patient. And it's an agreed order. It was not a ruling by the judge deciding this. This was, we cited this in our brief, it's contract law. It's construed and it's construed against the person who asked for it. Well, is it your position that this witness, to your understanding, was always to be only a consulting witness? At the time this order was entered. At the time the order was entered. After he was disclosed as an expert, testifying expert, was he deposed? Yeah, we took his deposition as a 213F3 expert after there was a formal disclosure of him as an F3 expert, which was well after this order was entered. All right, so you knew going in that he was going to be testifying. Well, we knew after the judge, we assumed after the judge denied our motion to bar him that he was going to be allowed to testify. And then after he was disclosed as an F3, which they hadn't said they were for sure going to do, we brought that motion preemptively after he was disclosed as an F3 based on the judge's previous ruling, you know, that was the law. How did it come out that he treated the patient? How did I? At the trial. I mean, who brought out the fact that he was, he had performed surgery on this young patient in 2003, I think it was. I believe it was probably mentioned in an opening statement and I'm sure it was mentioned in his direct examination. There was not, there was virtually no discussion at trial about his treatment. That's why I mentioned before to your colleague that he was there solely, if not mainly, as an advocate on the liability part of the case. Yes, but isn't part of your contention that the jury was basically aware that he had treated this patient and yet he was still, he was more an advocate for the defendant doctor? That's absolutely correct. That the jury was aware he had treated Luis and that he was, and they heard his testimony, that he was there saying that Luis didn't have a case. Let me ask you one question that has me confused. I think you told us that you did not object to Dr. Locke's testimony after the motion to eliminate was denied. I said what I believe occurred and I just, I don't have a reference to the record. In the pretrial proceedings when we went through motions to eliminate with Verander and various things like that, I believe on the record there was a discussion about, you know, you ruled on this, we understand you're not going to change your mind, there's no point in bringing our motion, and as I mentioned the post-trial motion, her ruling on it is clear that she would not have changed her mind. Okay, so the record would be very clear that you would have felt an objection would have been a useless act. Exactly. Well, for a couple, she had denied the motion, she denied a motion for reconsideration and the Supreme Court denied the supervisory order we requested. I think the record was pretty clear by that point that, you know, that, you know. Well, there's still cases out there that hold that you have to renew the objection, you know, unless it's a useless act, so I assume that you're saying that this is a useless act. Well, I believe we did renew our objection on a pro forma basis in the process just before the trial actually started. He's talking about before he testifies. Well, you mean immediately before he went on the stand? Right. I can't recall if that's on the record or not. I was not suggesting a waiver when I asked that question. Okay. You made a motion to borrow. It was done timely. You did renew the objection in your motion for a new trial. I wasn't getting at that. Okay. Although there is certainly case law that says you have to renew the objection at the time the witness testifies. Their position is that there was a waiver here in the sense that you agreed to allow him to continue as a consulting expert. Right. And as we've addressed in our brief, and I would reiterate if I have an opportunity here, is that the order specifically does not allow him to testify. It's an agreement between the parties that he can consult with them on things not involving his own treatment, which would be before that, and he cannot talk to them about his own treatment. It does not say he can testify at trial. In fact, he was going to testify at trial at that point. In a sense, that's the division between the issue before us and the Petrillo ruling. Exactly. I see for a little longer. Still have time to respond? You have a couple more minutes. Okay. Thank you. Because I'd like to address the other key point with just a few moments is the instruction, the jury instruction. You know, standard of care, jury instructions in these cases, it's clearly a matter of law for the most part. And the court here I think is presented with an issue of at what point in time does the court have to step in and say that a specialty that is characterized in an IPI, in a professional malpractice case, can be defined by a limited number of people in the profession as opposed to a true definition that is subject to legalities. And why it's important in this case is that the instruction we wanted said cardiologist. Okay. Dr. Lasseter, our F3 expert, was a board certified cardiologist. He also was board certified in interventional cardiology. And that was our second choice, interventional cardiology in terms of the verbiage that is used in four instructions. This appears in four instructions. Although Dr. Lasseter doesn't treat patients that are 16 or younger, the evidence was undisputed that the informed consent issues are the same regardless of whether it's a child or an adult. The only difference is the informed consent is given to an adult when a child is involved. But otherwise the standard of care is the same. So whether you're a pediatric interventional cardiologist or a, quote, interventional cardiologist, there shouldn't be a distinction. Did Dr. Ruiz refer to himself as a pediatric interventional cardiologist? I know that Dr. Ruiz was not even board certified in interventional cardiology. He wasn't board certified in pediatrics. He was a cardiologist is my view and maybe an interventional cardiologist. But the point of adding the pediatric word in there from the defense standpoint was to load the case so that it was in essence a directed verdict based on the instructions to the jury because adding that word, because technically Dr. Lasseter said I'm not a, quote, pediatric interventional cardiologist, but it was a red herring in the case. It would be somebody who's giving informed consent for an interventional cardiology procedure, which he was clearly qualified to do. It was misleading. It steered the jury completely in that direction. My question goes to the standard of care that you just mentioned. And what is your principal argument here that drove the case in favor of the doctor? You talked about the lack of informed consent and then you also make reference to the procedure, Dr. Ruiz's performance in the procedure itself. I'm unclear. No, and I apologize if there's any confusion. Actually, our number one argument in theory of the case was that this procedure should have never even been discussed with this patient under these circumstances. And that's what Dr. Lasseter What kind of standard of care is that? I don't understand that. When the parents come in asking for a non-surgical intervention for their son and the patient is in fact referred to Dr. Ruiz because he can do this non-interventional procedure, how can you say they shouldn't have discussed that? Well, I'll give you an extreme example, but the logic applies. If a patient comes in and says, cut off my leg because it hurts me, and the doctor knows you shouldn't do that, is the doctor within the standard of care for him to do that? You're right in that it's an extreme example that doesn't help me at all. But that's exactly what the evidence was in this case, including objective evidence, the publications of lack in his group, that this patient with his condition was not a candidate. So what does Dr. Ruiz have to do with the parents who say we want a non-intervention procedure performed on our son? I'm not going to do the wrong thing. And he even claims he told them it was the wrong thing. Who says it was the wrong thing? He said that he Did Dr. Locke say it was the wrong thing? I'm not saying it was the wrong thing. You're talking about he wasn't a candidate for this surgery. Okay. Well, what Dr. Ruiz said he told the family is that this was a surgical case, he shouldn't have the stenting procedure, and it was too risky. That's what he said he said. Nobody corroborates that. Everybody had him saying the exact opposite of that. And that's what he should have said. But he didn't. And he should have had the surgery that they ultimately ended up doing under emergency circumstances, under elective circumstances. I think Justice McBride has a question regarding the CAF conference. Well, the conference. Yeah. Do you believe those other doctors suggested what you're saying? What those doctors did, if you look at the totality of it, Dr. Ruiz comes to the CAF conference, says I'm going to do this procedure on this patient, and they all deferred to him because they weren't experts in doing interventional procedures like he was. The surgery isn't checked off as a recommendation. And every one of them said that they were deferring to him. And the publications, as I say, the objective publications that Dr. Locke disavowed in order to defend the case all say that he wasn't a candidate for this procedure. Didn't he only disavow the one statement in that one publication? Well, he disavowed. In that one statement? No, he disavowed his book and he disavowed the 93 publication. Didn't he disavow one line in the 93 publication? But it's the key line. It's within or adjacent to the myocardium. That's exactly what this patient was. And then you say he disavowed his entire book? No, he disavowed the statements in his book that related to this specific circumstance in order to give the testimony that he gave. All right. You'll have a couple more minutes for everybody. Thank you. Good morning. May it please the Court. My name is Jim Horstman. I'm the attorney for Carlos Reeds, MD. At the council table with me is Mr. Kamanerik. He represents Children's Heart Center. I'm going to make the principal argument. If you have questions for Mr. Kamanerik, he's available. Let's start at the last argument that was made, and that was regarding the jury instructions, the identification of the expert. And here's one concern I have, is that when jury instructions start recognizing specialties by virtue of the claim of the expert that he falls under that specialty, where's the line to be drawn? I mean, how many individuals can come into court and say, I am this type of specialist, and therefore I want this sort of jury instruction to name this specialty to the jury? Where does that stop? And what sort of, is it just anywhere? Anyone can come in and claim that specialty? It doesn't require board certification. We know that because the number of board certifications How about a prior case where it's recognized? That would be one way to do it. Do you have one? No. The direct answer to your question is, it's determined by the evidence in the case. That sounds circular to me, because that goes back to the expert's witness testimony. His claim is the evidence in the case. It's not completely circular, though. Here we've got plaintiff's own experts used and recognized and did not object to the descript or pediatric interventional cardiologists. They used the term themselves. You've got Dr. Ruiz and Locke talking about Should there be a difference between what individuals testify to and what the jury instructions say? Because there is some force to counsel's argument that the jury instruction itself set the standard for the weight to be given to experts. And when the plaintiff's expert does not identify himself as that expert identified in the jury instruction, that sort of makes the plaintiff's expert start ten yards behind the defense expert. And then it's a question of who gets to the finish line first. And the jury determines that. And, you know, starting behind makes it a little difficult. Sure. I understand why the plaintiff doesn't like this instruction. Well, the question is, should we allow this sort of instruction? Sure. Like in every other case, the instruction has to be supported by some evidence. The trial judge has to evaluate that evidence. Here there was evidence to support the contention that pediatric interventional cardiology is a specialty. You've got Ruiz. You have Locke. You have the plaintiff's own experts. Who recognizes it? I thought that Dr. Locke said I basically dubbed myself. And a number of other doctors have done the same. We've dubbed ourselves as experts in the field of pediatric interventional cardiologists. I believe what he said is that there's no board of certification, but it is a designation based upon experience rather than some third party's recognition. What kind of experience did Dr. Ruiz have regarding this very same specialty, if you're talking about experience? What did he testify to that was his experience? He had done one of the procedures before. One. Yeah. He said he was aware of the procedure being done by other people. Dr. Locke said he's been training physicians in this area for 25 years. Do you think that in a general sense that someone who had performed one interventional procedure, such as Dr. Ruiz, that in general people would consider that? And he's aware that other people have been doing it? Do you think in general that would qualify him to say I'm an expert in this area? Having done one and being aware, apparently there were others that had done them, but he himself had not. It has to start somewhere. Of course. But does it start with one procedure? The biggest part of the answer to the question is, this is not the only pediatric interventional cardiology procedure. This is one of them. Had he testified, though, that he had done multiple pediatric interventional cardiology procedures? Had he testified to that? Or was this really the only one involving a patient that was under 16? No, I think that the record does bear that out. It does. I don't think that it's right to focus on this one particular type of procedure, because pediatric interventional cardiology encompasses a whole range of procedures where guys like him try to avoid surgery. So you believe the record would suggest, when he talked about his own qualifications, that there is a suggestion that he had performed many pediatric interventional cardiology procedures without surgery? I do. Oh, okay. And Dr. Locke supports the specialty in general, talking about the training program. Well, that was one of my concerns, is when you basically are using Dr. Locke to basically pass on that expertise to his former students. And that seems that the experience doesn't quite make the grade there. Either it's experience or it's who you've been taught under. Experience and educational, sure. But at the other end of the spectrum, we know for sure that it does not require board certification. Mr. Horstman, let's talk about the difference, if there is, between the agreement that Dr. Locke could continue to consult versus becoming a testifying expert. Do you see that there's any distinction or not? I understand the distinction being made by plaintiff's counsel. I have a few things to say about that. The first is that the factual predicate that the plaintiff has been assuming throughout, that Dr. Locke was initially retained solely as a consultant, isn't true. It just isn't true. Do we really even go into why he was retained? I mean, we don't even concern ourselves, and I don't know that he concerns himself. He only concerns himself with what you're going to use the expert for. I just want to make that clear, because there's a suggestion that there was a transition somewhere along the line. It's not true. Well, then why was he called a consulting expert in the agreed order? What does that word mean? It has some meaning. Consulting retained expert. Does it say consulting retained? Yeah. It says, consulting pediatric cardiology, I'm sorry, retained consulting pediatric cardiology expert. Retained means paid, given a fee for his service. Right. For consulting. Does that suggest he was going to be testifying? The reason the consulting is in there is that. . . Because that's what you could agree to. This was back in 2003. Yeah. The 213 disclosures had yet to be made. Right. He was, in fact, at that time, a retained expert. Okay. The disadvantage I suffer here is that plaintiff is asking you to draw inferences from the absence of a record that he's responsible for. The only part of this, part of the case that you have before you is the agreed order. There was hearings. Doesn't it kind of make sense that they didn't have an objection to him being consulted constantly, up to the point that he began his treatment with the patient, but they weren't expecting him to come in and be the expert, so to speak, the testifying expert at trial. And when they realized that that's what this had become, they made a motion to bar. Well, let's get to that. They rely on Petrillo. The linchpin of Petrillo is that confidentiality and consent are linked together. Petrillo does not bar a defense attorney from bringing forth evidence that the plaintiff has consented to. Now, when he relies on Petrillo, it's ironic, because when you read this agreed order, he is allowing Dr. Ruiz and his attorneys to talk to Dr. Locke about everything concerning Dr. Ruiz's treatment of the patient. We could talk, by terms of this order, we could talk to Dr. Locke about everything up to the point that Dr. Locke begins the care. Are you saying that once a Petrillo waiver occurs, and let's assume for the moment that Petrillo waiver occurred by virtue of that agreed order, that it necessarily leads to a judicial ruling that the expert that is the subject of that waiver can now come in and testify as an expert witness for the defendant? Doctor? I believe that Petrillo allows that. What plaintiff here is focusing on is the sanction that usually is used for a Petrillo violation, but we don't have a Petrillo violation because the plaintiff allowed Dr. Ruiz to talk about the full range of issues up to the time that Dr. Locke began the treatment. What I see this, I mean, what I'm trying to grasp is, was there an agreement that Dr. Locke could, of course, consult, because he, in fact, was retained by the defendant doctor before he treated the patient? Was that the agreement that, you know, he was there first, that Dr. Ruiz was there first? He had retained Dr. Locke to consult on his case. But subsequent to that, the patient is treated by the same doctor. Now, what I'm trying to grasp is, was this an agreement that he be allowed to continue to consult, but there was really never a thought that he was going to come in and be the expert testifying? No, that was not the case. That's what I was saying before. From day one, defense counsel for Dr. Ruiz retained Locke as a retained expert. But why is the wording, then, consulting retained expert? I mean, I don't, I guess what you're saying is there's really no difference between a doctor that is consulted on a case versus one who will come in and be a testifying expert at trial. Well, there's a difference between a Rule 201 consultant and a 213 retained expert. Yeah. For sure. Is that what this agreement suggested, that he was a 201, not a 213? They moved to bar when they were alerted to the fact that perhaps he's going to be something else, and then the trial court said, no, I'm not going to bar him. No. The plaintiff is fudging with his terms. 201 talks about a consultant. It's a term of art. The word consultant does not appear in this order. What appears in this order is that we're allowed to use Dr. Locke as a retained expert. The word consulting is in there because he wasn't testifying at that point. The 213 disclosures hadn't been made. Right. But when you ask, was it anticipated that he would only be a consultant, I'm saying to the court, it was never anticipated that he would only be a consultant. But there is a problem here with the timeframe, because at the time the agreed order was entered, he hadn't been named as a 213. That's true. And, in fact, why don't we change the question before us a little bit and ask whether that agreed order can, in fact, anticipate your 213 disclosure down the line and use that agreed order as some sort of waiver of the disclosure that you're going to make down the line on a 213F disclosure. I find difficulty in seeing that. I don't know why. Because, remember, this isn't a case where the No, I'm basing it on your own position that you say that, you know, we retained him as a consulting expert. We didn't know whether we were going to use him as a testifying expert. And so how can you use that very same agreed order that you interpret the way you've just described it as one that down the line bars the plaintiff from challenging the use of that expert as a testifying expert based on that agreed order that you've just described as not broaching that determination? Well, I'm not saying it didn't broach that determination. Remember, in this case, this isn't a case where a defense counsel ignored or defied Petrillo. The defense brought up the issue, came to the court, motioned for a protective order, saying here's the circumstances. We've been using Locke. We need to continue using Locke. Well, that's because, isn't it because the patient became aware that Locke, who figured this out first? Dr. Locke did not inform the patient that he was consulting on a case involving a young patient who had a particular type of procedure that he was extremely familiar with. Where it came up was plaintiff's attorney said Luis is treating with, I think he said James Locke. He had the wrong first name. Gave it to defense counsel. Defense counsel then went to Locke and said, what about this? Locke said, I have no idea. I'll check. And he says, yeah, it appears to be the same kid. I don't think that there's a problem with the wording of the agreed order, but if there is, the burden doesn't fall on the defense here. Again, plaintiff is contending that the agreed order is somehow a contract. It's not a contract. The whole proceedings surrounding the entry of this order are not before the court. That doesn't rest on the defense. That rests on the plaintiff, and he is trying to use the absence of a record to his advantage here. What we have to look at is the terms of the order. Retained expert is a 213 term, and that's what was anticipated. If there's ambiguity, if plaintiff now thinks there's ambiguity or lack of clarity in the order, it was up to him to clarify. Well, they objected to the witness testifying. I mean, it's not like they agreed to his testimony. They moved to bar. And in front of the jury, we have an expert, essentially, who has treated the patient and at the same time is saying to the jury that what the doctor did was absolutely within the standard of care. They did object, but I'm sure you remember Judge Duncan Bryce's principal reaction to this thing was, oh, my gosh, 26 months later, you're going to come in? This case is already an old case that's been moving along. Her biggest reaction to this was, it's far too late. How much after the Rule 213 disclosure did they come in, or is that in between? I know the motion to bar came 26 months after the agreed order was entered. But when was that in relation to the disclosure that he was going to be a testifying expert? I don't recall. I don't have that. So that's really more important than the 26 months, isn't it? If they were under the impression that, you know, he's consulting, fine, we understand that. But, you know, we weren't aware he was going to be a testifying expert, and then they came in to bar. Here's the practical problem with that. It's them just saying that now after they've lost the case. What this really was is a litigation tactic. They waited 26 months after the agreed order. They saw the defense had the best expert in the world, and what a great way to get him barred. What I'm worried, obviously I want the court to affirm the judgment in this case. I'm really worried about if it goes the other way, what's going to happen in other cases? What a wonderful way for plaintiffs to get defense experts barred. It was a litigation tactic. Why wouldn't the lesson to be learned is do not enter into agreed orders that are perhaps ambiguous or do not specify the exact role to be played by this expert in the litigation? I think the order is pretty good. When you look at the terms in 201 and 213, the word consultant doesn't appear there. If that's what plaintiff wanted to limit it to, then that should have been in there. All right. You can wrap it up in a couple minutes or one minute. Yes. I want to be sure that the court understands as to what Dr. Locke testified to. He didn't testify to standard of care. He testified to the damages you were saying? No. He testified as a standard of care, but what he didn't testify to was anything to do about his care of Luis. He didn't say anything about Luis that told him, no confidential medical information about Luis. He just gave the one opinion. He said that it was reasonable for Dr. Luis to attempt this procedure. So there was no violation of the agreed order. He stayed completely away from talking about his treatment of the child. When you say that it was reasonable for Dr. Luis to attempt this procedure, was there really clear testimony by the plaintiff's expert that this procedure should not have been attempted given the information about Mr. Young-Ruiz, or the young plaintiff, or did he simply testify regarding the disclosure that the parents simply weren't informed enough about the risks involved in this procedure? I think it was both. It was both? Yes, I think it was both. And, you know, even this Locke issue, eventually a plaintiff gets down to arguing that, you know, this is what the defense verdict rests on, was Locke's testimony. Without Locke's testimony, the case would have gone the other way. Well, you certainly outlined that in your brief. Okay. You've got that. I just have one question to you. Are there any cases that you know of where a treating doctor can be a defense-retained expert? I don't know of any, and I think this is a unique case. I don't think that we have any other cases that come anywhere close to trying to apply a patrillo in a situation where there's consent, and that's really what we have here. There's clearly a consent. Plaintiff now, after the fact, is arguing about what the scope and extent of the consent was. But I don't think that we do have another case. I understand that this is a unique situation, but what kind of message do we give to the legal community if we stamp approval, you know, and a general sense of allowing a treating doctor to be a defense-retained expert? Well, remember the sequence here. Yes. That Locke was retained years before he treated. No, I understand this is a very unique circumstance in this case. The message I think you'd be giving is it's up to the plaintiff. When other parties find themselves in this very strange situation, if the plaintiff wants to continue treating, which is what the whole motivating force here was, Luis had a chance to be treated by the best doctor in the world, the message should be that they have a choice. They have the option to go ahead and do that, even if it might not be helpful to their position in litigation. Thank you. Thank you. Mr. Hibeson, brief rebuttal. If you'll just indulge me, I can't take more than two minutes. I want to clear up some misconceptions that have fallen at this point about this agreed order, just kind of in a chronological way and address them. Excuse me, Mr. Hibeson. I do want to interrupt you and give counsel an opportunity to, on behalf of the Heart Center, whether there was a short statement you'd like to make that might precipitate some sort of questions from us. Nothing very short, Your Honor. Because Dr. Ruiz was sued as an employee of the Children's Heart Center, therefore we were responsible for what he did. The issues were the same. The evidence was the same. My argument would be the same as Mr. Hortzman's. I'm not going to really add anything more to that, other than to point out that this agreed order was intended, obviously, to get around the patrillo rule, so it wouldn't be violated by anybody in this case. Are we really confined to just, is this really just a patrillo case? It's not just a patrillo case, no. But the purpose of this order was because of that rule, and that's why it was entered. Dr. Locke had been retained two years before this treatment started by him. Well, let me ask you, do we read the rule, keeping in mind the holding in patrillo, and the question is do we read patrillo broadly or do we read patrillo strictly? Well, I think since patrillo, there's been a lot of cases deciding how that should be applied. Some cases have applied it strictly and other cases have not. In this situation, I think everything was done to comply with the patrillo decision. That's why this order was entered. In fact, the order reads that Dr. Ruiz and his attorneys can continue to retain, consult, and communicate with Dr. Locke about the case as long as they don't talk about the treatment. And in the order, it even says that he can communicate with his retained consulting pediatric cardiology expert, Dr. James Locke. So at that very time, he was designated as an expert, and it was only a given that he was eventually going to be disclosed as an expert. All right, well, thank you very much. Other than that, I have no other comments unless anybody has any questions. All right, thank you. Okay. So you can use your two minutes any way you like. Okay, thank you. I just want to make one comment about one thing Mr. Horton said. Dr. Locke did not give an opinion on informed consent. No. There was no opinion from him. All right. But let's talk about this agreed order. I just want to clear up what I think might be some misconceptions as you come away from this argument. Number one is the agreed order was entered. There were no proceedings. That's why there's nothing in the record. This was an agreed order that was negotiated between counsel. There is no record missing from your honors. This was an agreement, and it says what it says. Number two. Well, is it your burden to show us what this agreement meant? I mean, what were you agreeing to by way of this order? I think this order is very clear. And with all due respect, if somebody disagrees with me, I can't explain that. But I think this is very clearly worded. I think it was very carefully worded. The word testifying is not in it. The word consulting is. His treatment was distinguished as a patrol thing. The prior relationship consulting before the treatment is distinguished differently. What about this notion that the doctor hired, he consulted, he hired Dr. Lack for this very purpose, for this litigation. He was really first in line. Right. He got the best. Several years later, the patient consults with this doctor. Is this a way that prevents the doctor from having the expert that he sought out, chose, you know, consulted with, retained? I mean, what is your response to that? In another case, yes, but that's not what happened here. The reason there was a 26-month gap before the motion to bar him as a testifying expert occurred, okay, was because his deposition wasn't taken until that far after this agreed order was handed. No, I'm not talking about the 26 months. And the decision wasn't made based on we didn't like what he was going to say. The decision was based on, as we pointed out in our brief, that was when we found out from his mouth, under oath, that he had never disclosed this to the family, okay? And that was the thing that put the whole patrol thing together to knock him out completely as an expert, is he had now admitted the thing that he's prevented from doing by patrol is to do this without disclosing to the patient. That was what the motion was brought for. We didn't know that until we took his deposition. And it makes no difference. And he had not been disclosed yet. So you're saying it makes no difference that he had already been retained by the doctor? I don't think that, the point is that he had not, their intention was unknown to plaintiffs, that they were going to call him as an expert at trial. They never said that. It's not in the order. There's no record of that. We brought a preemptive motion to prevent that. We found in his deposition that he had flat out concealed from the family the fact that he had been working for them, so there was no argument they had anymore that the family had consented to him treating them, and at the same time know he's an expert. Does it matter whether he had concealed it or not? In this case, I think it has some bearing on it. Is it dispositive? No. So whether this was inadvertent or not, your position would still be the same. Yes. And I think that's basically what I wanted to say about this order and the fact that we didn't know about the intent of the defendants. They never disclosed it. The order, there is no record to go along with it. The order is what it says, and we believe the order is clear, and it does not allow him to be a testifying expert. It's not an agreement to that effect. Thank you very much. Thank you. All right. The case will be taken under advisement.